**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SCOTT JOHANSEN and HYTEL GROUP | ) | PLAINTIFFS |
| | ) | DEMAND |
| Plaintiffs, | ) | TRIAL BY JURY |
| | ) | |
| v. | ) | Case No. 14-4994 |
| | ) | |
| OFFICER HAYDYSCH, OFFICER NEBLOCK, | ) | |
| SGT FERGUSON, VILLAGE OF HAMPSHIRE, | ) | Judge: |
| WILLIAM BURNIDGE, C & L FARMS, | ) | |
| CINNCINATI INSURANCE | ) | |
| | ) | Magistrate: |
| Defendants. | ) | |

**COMPLAINT AT LAW**

NOW COME Plaintiffs, SCOTT JOHANSEN and HYTEL GROUP, INC, by and

through their attorneys, THE LAW OFFICES OF SCOTT T. KAMIN, and complaining against

Defendants, OFFICER HAYDYSCH, OFFICER NEBLOCK, SGT FERGUSON, VILLAGE OF

HAMPSHIRE, WILLIAM BURNIDGE, C & L FARMS, and CINCINNATI INSURANCE

states as follows:

**JURISDICTION**

1. This action arises under 42 U.S.C.1983, 28 U.S.C. 1367, the Fourth, Fifth, and Fourteenth

   Amendments of the United States Constitution.  The jurisdiction of this Court is invoked

   pursuant to 28 U.S.C. 1331, 1343(a)(3).

**VENUE**

2. Venue is provided under 28 U.S.C. 1391(b)(1) and (b)(2) in a judicial district where any

   defendant resides, if all defendants reside in the same State or in a judicial district in which a

   substantial part of the events or omissions giving rise to the claim occurred.

3. Upon belief Defendants OFFICER HAYDYSCH, OFFICER NEBLOCK, SGT FERGUSON, VILLAGE OF HAMPSHIRE, WILLIAM BURNIDGE, C & L FARMS and CINNCINATI INSURANCE reside in the State of Illinois and the Northern District of Illinois. Upon belief, the remaining defendants reside in the State of Illinois.

4. The events giving rise to the claim involved in this cause occurred in the Northern District of Illinois.

5. Plaintiffs are both residents of Kane County, Illinois which is located in the Northern District of Illinois. Plaintiff HYTEL GROUP, INC. ("HYTEL") is a corporation headquartered in Kane County and incorporated in Illinois.

6. Upon belief, Defendant OFFICER HAYDYSCH ("HAYDYSCH") was, at all times relevant to this action, employed by the Village of Hampshire as a police officer with the Hampshire Police Department.

7. Upon belief, Defendant OFFICER NEBLOCK ("NEBLOCK") was, at all times relevant to this action, employed by the Village of Hampshire as a police officer with the Hampshire Police Department.

8. Upon belief, Defendant SGT FERGUSON ("FERGUSON") was, at all times relevant to this action, employed by the Village of Hampshire as a police officer with the Hampshire Police Department.

9. Upon belief, Defendant CINCINNATI INSURANCE ("INSURANCE") is a private insurance corporation doing business in Illinois.

10. Defendant VILLAGE OF HAMPSHIRE ("HAMPSHIRE") is a municipal corporation within the State of Illinois, and was at all times material to this action, the employer of Defendants

HAYDYSCH, NEBLOCK and FERGUSON.

11. Defendant BURNIDGE ("BURNIDGE") is a resident of Kane County and is the principal of Defendant C & L FARMS.

12. The individual defendants are sued in their individual capacities.

**FACTS**

13. In 1993, HYTEL signed a lease for use and possession of the property located at 290 Industrial Drive, Hampshire (the "Leased Premises"), becoming the tenant of the Leased Premises.

14. Sometime thereafter, ownership of the Leased Premises was transferred to C & L FARMS, who thus became the landlord of HYTEL. Defendant BURNIDGE, as the principal of C & L FARMS, became the de facto landlord of HYTEL.

15. Under Article 11 of the Lease for Leased Premises, the lease states, "ANY TRADE FIXTURES BELONGING TO AND INSTALLED BY THE Tenant in the Leased Premises prior to or during the term of this Lease are to be and remain the property of the Tenant no matter how they may be attached to or incorporated in the Leased Premises, and Tenant shall have the duty to remove same at the termination of this Lease and to repair, at its own expense, any damage to the Leased Premises caused by the installation or removal of such fixtures."

16. HYTEL installed and owned all the Trade Fixtures it used in the Leased Premises.

17. HYTEL operated successfully for several years. However in 2011 the firm was not as profitable as it had been. HYTEL could not afford to continue paying the approximately $15,000 monthly rent on the Leased Premises. HYTEL decided to move its factory to a new

location, 300 Lake Street Elgin.

18. On February 8, 2011, C & L FARMS filed a forcible entry and detainer against HYTEL.

19. On July 8, 2011, in spite of BURNIDGE's ill feelings toward JOHANSEN, Plaintiff HYTEL, through its principal, JOHANSEN, signed a Mutual Release and Settlement agreement with Defendant C & L FARMS, in which the parties agreed to terminate the lease in exchange for $100,000.00 to be paid at a rate of $3,000.00 per month.

20. During the negotiations for the final settlement amount, Cathy Hurlbut, one of HYTEL's attorneys, offered to sell the same "trade fixtures" in the Hampshire building that JOHANSEN was later accused of stealing, to C&L FARMS and BURNIDGE for $90,000. This offer was declined by their attorney, Mr. Widerburg on July 9, 2011.

21. After the Settlement Agreement was finalized in court, C & L FARMS principal BURNIDGE accosted the attorneys representing HYTEL outside the courtroom and, holding a newspaper containing an article about HYTEL moving to Elgin, stated to HYTEL Attorney John Hurlbut " "the criminal [JOHANSEN] is trying to escape", indicating great frustration that HYTEL was trying to continue operations rather than dissolve. BURNIDGE's lawyers restrained BURNIDGE.

22. Under the terms of the Settlement Agreement, HYTEL was to move out of the Leased Premises by July 22, 2011. BURNIDGE was required to provide access to the Leased Premises to permit the move. Once HYTEL was finished removing its trade fixtures, it was required to clean the Hampshire factory and return it to code.

23. Realizing HYTEL was not going to be able to move out on time, JOHANSEN persuaded BURNIDGE to permit HYTEL to stay in the building until the move was complete.

BURNIDGE and JOHANSON had regular communications about the status of the move out.

24. On September 27, 2011, Defendant C & L FARMS changed the locks to the Leased Premises without any notification to HYTEL. BURNIDGE, claiming he was evicting HYTEL, contacted the Kane County Sheriff's office, who sent Deputy Seidelman to post an eviction notice on the Leased Premises. At that time, BURNIDGE and Seidleman inspected the building and noted the condition of its electrical systems, and the fact that much of it was disconnected and moved out. Each time additional fixtures were removed from the Hampshire location, after Sept. 27th, HYTEL asked BURNIDGE to unlock the Leased Premises to give it access. Each time he would agree and unlock the building, staying at the building site and talking with Renee Mazza while other HYTEL employees removed the trade fixtures. He watched as they loaded the fixtures into the rented truck used to move them to Elgin. On several occasions, Deputy Seidelman and BURNIDGE were present together, watching HYTEL employees Renee Mazza, Angel Alcantara and Joe Yechout move equipment out of the building after the eviction posting on several occasions. HYTEL continued this movement of equipment periodically through the end of 2011.

25. Because the trade fixtures belonged to HYTEL, they remained HYTEL's property, and neither BURNIDGE nor Seidelman opposed their removal despite them being present during their removal many times – even after the complaint was filed and there was an active police investigation.

26. In October of 2011, BURNIDGE brought a representative of CINNCINATI INSURANCE ("INSURANCE") to view the disarray in the Leased Premises. BURNIDGE claimed JOHANSEN had stolen all of the trade fixtures and in doing so left the Leased Premises in

disarray. The INSURANCE representative agreed "theft or at least vandalism" had taken place and processed BURNIDGE's claim on behalf of C & L FARMS.

27. The representative processed BURNIDGE's claim without knowing that HYTEL's move required the mess.  The Mutual Release and Settlement Agreement clarified that HYTEL was required to pay for returning the Leased Premises to pristine condition – once the move was completed.

28. The search warrant and arrest prevented the move out from being completed.

29.  INSURANCE paid C & L FARMS more than $44,000 to compensate it for its supposed loss.

30. During this same time, a conflict arose between JOHANSEN and the Police Department of HAMPSHIRE, particularly officers Brox and FERGUSON.  JOHANSEN had reported a forgery theft of a substantial amount of money taken from HYTEL by a former employee. JOHANSEN was not satisfied with the investigation.

31. On one call to HAMPSHIRE'S Police Department, JOHANSEN swore vehemently at the officer on the other end for the Department's failure to take action in the forgery investigation.

32. FERGUSON ordered a copy of the tape containing JOHANSEN swearing at the police officer, and gave a copy to the Chief of Police for HAMPSHIRE.

33. On Sept. 14, 2011 Ferguson sent an email to Johansen threatening him that "the behavior you have exhibited at the Village Hall and on the phone with my dispatchers will only cause you to get criminal charges against yourself".

34. BURNIDGE, a business leader in HAMPSHIRE, followed through with his part of the

conspiracy with INSURANCE by enlisting HAMPSHIRE, through officers HAYDYSCH, NEBLOCK and FERGUSON, to frame JOHANSEN for the alleged theft of the trade fixtures. Given the attitude of HAMPSHIRE's Police Department toward JOHANSEN, it was only too happy to assist BURNIDGE in framing JOHANSEN.

35. On October 20, 2011, HADYSH started executing the conspiracy, claiming that BURNIDGE had filed a theft report, apparently insisting that he, not C & L FARMS, was the owner of the property in question, claiming that JOHANSEN, not HYTEL, had stolen his trade fixtures, including transformers, fuse panels and other electrical components.

36. INSURANCE told BURNIDGE that he should make a criminal complaint of theft against JOHANSEN so that the loss claim on behalf of C & L FARMS would be accepted. INSURANCE also noted that a criminal case strengthened INSURANCE's ability to pursue JOHANSEN through a civil subrogation case for their compensation as well as enhancing their ability to claim the seized equipment and sell it so it could be used to offset their losses, if a conviction occurred.

37. BURNIDGE, furthering the interests of INSURANCE and his own interests in destroying HYTEL and JOHANSEN, moved ahead with JOHANSEN's prosecution. In December of 2011, BURNIDGE gave a statement to HAYDYSCH, reiterating his unrealistic complaint of theft against JOHANSEN made two months earlier. Even though the issue should have been which corporation, HYTEL or C & L FARMS, owned the trade fixtures that were allegedly stolen, HAYDYSCH, NEBLOCK and FERGUSON permitted BURNIDGE to portray the issue as one between JOHANSEN and BURNIDGE.

38. HAYDYSCH also took a statement from Mazza, in which she stated to HAYDYSCH that

from July 22, 2011 to last August 2011 she and another HYTEL employee, Angel Alcantara, as well as J.D. Electric, removed property on behalf of HYTEL from the Leased Premises and took it to the new Elgin factory site. HAYDYSCH and NEBLOCK, in furtherance of the conspiracy to destroy JOHANSEN and HYTEL, never spoke with Angel Alcantara or the electrician, knowing his interview would be exculpatory, torpedoing the purported investigation into JOHANSEN.

39. The police additionally did not contact HYTEL attorneys John and Cathy Hurlbut, the HYTEL Registered Agent or the Law Firm that represented HYTEL in the Mutual Release and Settlement Agreement.

40. HAYDYSCH and NEBLOCK requested all documents and contracts from BURNIDGE and C&L FARMS. These documents included the Lease for Leased Premises and the Mutual Release and Settlement Agreement. Obtaining these documents would promote the ruse that HAYDYSCH and NEBLOCK were conducting an impartial theft investigation; the defendants did not realize the documents were exculpatory, providing strong evidence that the allegedly stolen items belonged to HYTEL, and that neither BURNIDGE nor JOHANSEN had any ownership interest in them. Even after the documents were obtained, the police still did not contact HYTEL's Law Firm or BURNIDGE's attorney in the forcible action, Mr. Widerburg. The defendants knew that the lawyers would only highlight and corroborate the exculpatory nature of the documents.

41. Only because they were co-conspirators of BURNIDGE and the other defendants did HAYDYSCH and NEBLOCK continue with the theft investigation of JOHANSEN.

42. INSURANCE also obtained a copy of the Lease and the Mutual Release and Settlement

Agreement.  Even though INSURANCE learned the property allegedly stolen from C & L

FARMS probably belonged to HYTEL, it advised BURNIDGE to proceed with his

fraudulent theft claim.

43. Though any reasonable, independently operating investigating officer would not pursue a

claim by an alleged victim of theft who could not prove he was the owner, and with almost

absolute proof that the owner was a third party, Officers HAYDYSCH, NEBLOCK and

FERGUSON pursued the prosecution of JOHANSEN.

44. BURNIDGE stated to co-conspirator INSURANCE that he believed that HYTEL was going

to transfer all of HYTEL's assets to JOHANSEN's wife's company and thus avoid any of the

payments that C&L FARMS was owed by HYTEL.

45. On January 4, 2012, HAYDYSCH lied to a tribunal that HYTEL's trade fixtures were

evidence of theft by JOHANSEN in order to obtain a search warrant to HYTEL's Elgin

location.

46. C&L FARMS continued to send notices to HYTEL and JOHANSEN regarding the status of

the Mutual Settlement and Release Agreement all the way through December 2011.  On

January 3rd, 2012, HYTEL and BURNIDGE discussed the Settlement agreement for the last

time when BURNIDGE complained to JOHANSEN that he had bought a building rather than

paying what he owed..  He was told that HYTEL did not buy anything; JOHANSEN's wife's

company had bought the building.

47. On January 5, 2011, in furtherance of the conspiracy, HAYDYSCH, FERGUSON and

another officer executed the out of jurisdiction search warrant on HYTEL by pulling all the

trade fixtures off the walls and floor, and confiscating them, ostensibly as potential evidence.

48. As anticipated by BURNIDGE, the supposed execution of a search warrant destroyed HYTEL's ability to operate and devastated JOHANSEN. BURNIDGE's conspiracy had achieved the results BURNIDGE desired.

49. After executing the search warrant on January 5, 2012, HAYDYSCH and FERGUSON furthered the conspiracy with BURNIDGE, C & L FARMS and INSURANCE by arresting JOHANSEN, claiming that Mazza gave probable cause when she said "I new (sic) what [JOHANSEN] was doing was wrong." HAYDYSCH signed the complaint of felony theft against JOHANSEN.

50. HAYDISH, NEBLOCK and FERGUSON knew that HYTEL was moving out, not JOHANSEN; that JOHANSEN was not even present during much of the move.

51. On February 24, 2012, HAYDYSCH furthered the conspiracy by fabricating evidence to the Grand Jury in order to secure JOHANSEN's indictment for felony theft by claiming that Mazza identified property in HYTEL's possession that actually belonged to BURNIDGE - when in fact Mazza did not know ownership of any of the property, only if it was removed from Hampshire.

52. On or about December 20, 2013, the bill of indictment and the corresponding criminal case in Kane County, 12 CF 33, was *nolle prosequied*. Once prosecutors reviewed the evidence, they realized it was a civil matter that never should have been prosecuted.

53. Have achieved the three objectives of the conspiracy: the destruction of HYTEL; the punishment of JOHANSEN by the destruction of his company, by his arrest and by his prosecution for felony theft; and the justification of the insurance award to BURNIDGE, none of the defendants, BURNIDGE, C & L FARMS or INSURANCE claimed any interest

in the trade fixtures they had previously insisted JOHANSEN had stolen.

## COUNT I: DUE PROCESS – FABRICATION OF MATERIAL EVIDENCE 42 U.S.C. '

## 1983 by HAYDYSCH, FERGUSON and BURNIDGE

54. Plaintiff restates and realleges all the statements made in paragraphs 13-53 of this Complaint as though fully set forth herein.

55. When BURNIDGE made statements that items were stolen from him by JOHANSEN and when HAYDYSCH claimed that Mazza corroborated BURNIDGE's allegations, such false statements, foreseeably and predictably, were seen as material evidence by prosecutors and used to prosecute JOHANSEN, these defendants violated.

WHEREFORE Plaintiff respectfully requests that this Court enter judgment against the individual defendants, and:

    a.    award compensatory damages in an amount not less than $5,000,000.00;
    b.    award punitive damages against the individual defendants in an amount not less than $100,000.00 each;
    c.    award Plaintiff JOHANSEN his attorney's fees; and
    d.    grant Plaintiff such further relief as this Court deems equitable and just.

## COUNT II
## MALICIOUS PROSECUTION against BURNIDGE

56. Plaintiff restates and realleges all the statements made in paragraphs 13-53 and 55 of this Complaint as though fully set forth herein.

57. Defendant BURNIDGE in conspiracy, initiated and/or continued a malicious prosecution against JOHANSEN, without probable cause.

58. These actions directly and proximately caused the injuries and damages to Plaintiff JOHANSEN, including requiring him to spend time in jail.

WHEREFORE Plaintiff JOHANSEN respectfully requests that this Court enter judgment against the individual defendants, and::

    a.    award compensatory damages in an amount not less than $5,000,000.00;
    b.    punitive damages against the individual defendants in an amount not less than $100,000.00 each;
    c.    award Plaintiff his attorneys= fees and costs; and
    d.    grant Plaintiff such further relief as this Court deems equitable and just.

## COUNT III
## MALICIOUS PROSECUTION of JOHANSEN by HAYDYSCH, NEBLOCK and FERGUSON

59. Plaintiff restates and realleges all the statements made in paragraphs 13-53, 55 and 57-58 of this Complaint as though fully set forth herein.

60. Individual defendants, individually and/or jointly and in conspiracy, initiated and/or continued a malicious prosecution against the plaintiff, without probable cause.

61.  These actions directly and proximately caused the injuries and damages to the plaintiff, including requiring him to spend time in jail and prison.

WHEREFORE Plaintiff respectfully requests that this Court enter judgment against the individual defendants, and::

    a.    award compensatory damages in an amount not less than $5,000,000.00;
    b.    punitive damages against the individual defendants in an amount not less than $50,000.00 each;
    c.    award Plaintiffs their attorneys= fees and costs; and
    d.    grant Plaintiff such further relief as this Court deems equitable and just.

## COUNT IV
## CONSPIRACY PURSUANT TO 42 U.S.C. §1983 against ALL DEFENDANTS

62. Plaintiff restates and realleges all the statements made in paragraphs 13-53, 55, 57-58 and 60  of this Complaint as though fully set forth herein.

63.  The above acts were committed with knowledge and by agreement of defendants

BURNIDGE, C & L FARMS, HAYDYSCH, NEBLOCK, FERGUSON and INSURANCE, to

willfully act in concert to violate the constitutional rights of plaintiffs JOHANSEN and HYTEL.

64.  Defendants BURNIDGE, C & L FARMS, HAYDYSCH, NEBLOCK, FERGUSON

and INSURANCE are therefore liable to plaintiffs for conspiracy pursuant to 42 U.S.C.

§1983.

    a.    award compensatory damages in an amount not less than $5,000,000.00;
    b.    punitive damages against the individual defendants in an amount not less than $100,000.00 each;
    c.    award Plaintiffs their attorneys= fees and costs; and
    d.    grant Plaintiffs such further relief as this Court deems equitable and just.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER ILLINOIS LAW

65. Plaintiffs restate and reallege all the statements made in paragraphs 13-53, 55, 57-58, 60

and 63 of this Complaint as though fully set forth herein.

66. The individual defendants intentionally engaged in extreme and outrageous behavior

against Plaintiff JOHANSEN.

67. The individual defendants are also liable for this intentional infliction of emotional

distress because it was proximately caused by their actions as set forth above.

68. Defendant=s outrageous behavior directly caused the plaintiff JOHANSEN to suffer

severe emotional distress including anxiety, fear, anger, depression and humiliation.

        WHEREFORE Plaintiff respectfully requests that this Court enter judgment

against the individual defendants, and:

    a.    award compensatory damages in an amount not less than $5,000,000.00;
    b.    punitive damages against the individual defendants in an amount not less than $50,000.00 each;

        c.      award Plaintiff his attorneys= fees and costs; and

        d.      grant Plaintiff such further relief as this Court deems equitable and just.

**COUNT VI**
**CLAIM UNDER 745 ILCS 10/9-102**
**AGAINST DEFENDANT VILLAGE OF HAMPSHIRE**

69. Plaintiffs restate and reallege all the statements made in paragraphs 13-53, 55, 57-58, 60,

63 and 66-67 of this Complaint as though fully set forth herein.

70. Defendant VILLAGE OF HAMPSHIRE was, at all times material to this Complaint, the

employer of Defendants HAYDYSCH, NEBLOCK and FERGUSON.

71. Defendants HAYDYSCH, NEBLOCK and FERGUSON committed the acts alleged

above in the scope of their employment as employees of the VILLAGE OF

HAMPSHIRE

WHEREFORE, pursuant to 745 ILCS 10/9-102, Plaintiffs demands judgment against the
employer Defendant named in this Count in the amount awarded to Plaintiff and against the
employee Defendant by way of judgment or settlement, including any and all amounts awarded
for damages and costs.

Respectfully submitted,

/s/ Scott T. Kamin
Attorney for Plaintiff

Scott T. Kamin
Law Offices of Scott T. Kamin
55 E. Jackson Blvd
Suite 1050
Chicago, IL 60604
(312) 322-0077
Ill. Attorney No.: 6226855